100 P.3d 691 (2004)
2004 OK 63
In the Matter of the DEATH OF Joe Luther GRAY, deceased,
Cathy L. Gray, Petitioner,
v.
Ultramar Diamond, Shamrock Corporation and the Workers' Compensation Court, Respondents,
American Home Assurance Company, Insurance Carrier.
No. 98,237.
Supreme Court of Oklahoma.
July 6, 2004.
G. Todd Ralstin, Oklahoma City, OK, for Petitioner.
John S. Oldfield, Jr., Oklahoma City, OK, for Respondents.
*692 KAUGER, J.:
¶ 1 The question presented is whether, pursuant to 85 O.S.2001 § 11,[1] the surviving spouse of an injured worker who dies during an operation which was necessitated because the employee sustained a work-related injury, is entitled to workers' compensation death benefits. We hold that the surviving spouse is entitled to death benefits because the unrefuted facts show the work-related back injury necessitated the pacemaker operation as a precursor to the back surgery.

FACTS
¶ 2 On May 15, 2000, Joe Gray (employee/injured worker) hurt his lower back while carrying insulation for his employer, Total Petroleum a/k/a the Ultramar Diamond Shamrock Corporation (employer) in Ardmore, Oklahoma.[2] The next day, he went to an occupational doctor in Ardmore. The occupational doctor diagnosed him with lumbosacral strain and prescribed an anti-inflammatory medication, a muscle relaxant, and restricted him from climbing or lifting anything over 25 pounds.
¶ 3 On May 23, 2000, after continuing to experience significant discomfort to his lower back, the occupational doctor ordered a scan of his lower spine. The scan revealed that the employee had a herniated disc. The occupational doctor continued the medications, modified his work duty, and recommended that the employee see a neurosurgeon to treat the disc. On July 13, 2000, the employee saw a neurosurgeon in Oklahoma City, Oklahoma, who recommended that a spinal diagnostic procedure be performed if his symptoms continued to worsen. The procedure was performed on July 26, 2000, and it confirmed a bulging disc with restrictions of the spine. On December 11, 2000, the neurosurgeon recommended surgery.[3]
*693 ¶ 4 On January 29, 2001, the neurosurgeon, apparently concerned that the injured worker had a twenty-year-old pacemaker and that, consequently, he might not be able to handle an extensive and lengthy back surgery, sent the injured worker to another doctor for consultation and pre-surgery screening.[4] Although the employee expressed no symptoms which would suggest a heart problem or a problem with the pacemaker, the doctor recommended a more thorough screening of the pacemaker because of the required, extensive and lengthy back surgery.[5]
¶ 5 On February 6, 2001, the employee went back to the doctor for a screening of the pacemaker. The screening showed that, although the pacemaker appeared in good shape, it was capable of pacing at times when it should not, thus raising the possibility of triggering an abnormal heart rhythm. Ultimately, the doctor recommended that the pulse generator of the pacemaker be removed and replaced in order to perform the back surgery.[6]
¶ 6 On February 21, 2001, the employee died while undergoing the procedure to replace the pulse generator of his pacemaker. On August 3, 2001, the petitioner, Cathy Gray (wife/surviving spouse), filed a notice of death and claim for compensation in the Workers' Compensation Court, seeking surviving spouse death benefits.
¶ 7 A hearing was held on April 3, 2002, at which the employer denied that the death arose out of and in the course of employment. The wife was the only witness present at the hearing. She testified that: 1) prior to the accident, the employee had not experienced any problems with his pacemaker; 2) he routinely had the pacemaker checked; and 3) it was recommended that the battery in the pacemaker be changed prior to the back surgery.[7] In addition to the wife's testimony, the deposition of an expert witness was presented. The physician, after reviewing all of the injured worker's medical records, determined that the worker's death was a result of the injury that he sustained to his back while working for the employer; and *694 that had he not sustained the back injury, the pacemaker surgery would have been unnecessary.[8]
¶ 8 The wife also included in her exhibits, letters and medical records which tracked the injured workers' medical treatments back and forth between the various doctors, documenting concerns about the pacemaker and its effect on the back surgery. Among the exhibits was a letter from the injured worker's doctor who did the pre-surgery screening in which he stated that the direct cause of death was an event which occurred during the pulse generator replacement. The doctor also recognized that "the only relationship that I can see is the fact that his referral risk assessment was made because of his back surgery" and that the employee may well have gone on for a period of time before any investigation was made into the functioning of the pacemaker.[9]
¶ 9 The employer did not call any witnesses, but offered a report of a doctor who had never seen the patient and who had formed his opinion based on medical records and who misstated the evidence. He thought that the employee's death had no connection to the back injury at all because the pacemaker was old and had not been checked in 5 years.[10] He did not offer any medical opinion as to whether the pacemaker surgery was necessary because of the back injury and scheduled back surgery nor whether the pacemaker surgery would have occurred "but for" the back injury. The doctor's opinion was also directly contrary to medical records of the employee which included evidence of a pacemaker check that occurred on September 9, 1999, only eight months before the back injury, which showed that the pacemaker *695 was operating within normal range.[11] The employer did not offer any other evidence to refute that the pacemaker operation was necessary as a precursor to the surgery for the back injury. According to the record, the only reason that the pacemaker operation was necessary was the need for the back surgery  which resulted from the work related injury.
¶ 10 The court, in an order filed April 12, 2002, denied the wife's claim for death benefits. It found that the husband's death did not result from an accidental personal injury arising out of and in the course of employment. On April 19, 2002, the wife appealed to a three-judge panel of the Workers' Compensation Court; and on August 27, 2002, the three-judge panel affirmed the trial court. On September 12, 2002, the wife appealed to the Court of Civil Appeals; and on December 5, 2003, the Court of Civil Appeals, in an unpublished opinion, sustained the order of the three-judge panel. We granted certiorari on February 17, 2004, to address whether the wife is entitled to death benefits.
¶ 11 THE SURVIVING SPOUSE IS ENTITLED TO WORKERS' COMPENSATION DEATH BENEFITS BECAUSE THE UNREFUTED FACTS SHOW THAT THE WORK-RELATED BACK INJURY NECESSITATED THE PACEMAKER OPERATION AS A PRECURSOR TO THE BACK SURGERY.
¶ 12 The wife argues that: 1) the death of the employee was a direct result of an admittedly compensable low back injury or, in the alternative, a consequential injury which directly flowed from the back injury; and 2) there is no competent evidence to support either the trial court's decision or the Court en banc's ruling. The employer concedes that the employee did indeed sustain a back injury arising out of and in the course of employment. However, it insists that: 1) the injured worker died as a result of a long standing cardiovascular condition and a pacemaker failure; and 2) the evidence produced at trial clearly established that the death of the injured worker had no connection to the back injury he sustained or the work he was required to perform.
¶ 13 Title 85 O.S.2001 § 11[12] provides that benefits are allowable for death of an employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of employment, without regard to fault.[13] Accordingly, the question here becomes whether the employee's death was causally connected to the back injury. In the Matter of Death of Stroer, 1983 OK 94, 672 P.2d 1158, addresses the causation requirements of the statute.
¶ 14 Stroer involved the question of whether death benefits were available when an injured worker commits suicide after incurring a work-related injury. The Court adopted the chain of causation test as the criteria for determining if an employee's death by suicide is compensable if the original work-related injury resulted in the employee's becoming dominated by a disturbance of the mind directly caused by the injury and its consequences. The Court held that the act of suicide is not an intervening cause of death and the chain of causation is not broken in cases where the incontrovertible evidence reflects that, but for the injury, there would have been no suicide.
¶ 15 The Stroer Court recognized that the burden is on the claimant to prove by a preponderance of the evidence that there was an unbroken chain of causation between the compensable injury, the disturbance of the mind, and the ultimate suicide. It also determined that: 1) although compensation will be denied if the suicide was caused primarily by non-work connected problems, the work-connected injury does not have to be the sole cause of the suicide; and 2) expert testimony is not absolutely indispensable  if the facts and circumstances are sufficiently persuasive, they may carry the burden of establishing *696 the requisite causal nexus.[14] A successful rebuttal breaks the chain of causation.
¶ 16 Although Stroer involved suicide, it illustrates how a causal nexus can exist between an event that occurs after a work-related injury and a resulting death  without breaking the chain of causation. The same rationale is applicable here. When an injured worker dies during an operation made necessary by a work-related injury, the operation would not be an intervening cause of death and the chain of causation would not be broken in cases where the incontrovertible evidence reflects that, but for the injury, the worker would not have had to have the operation.
¶ 17 An example of this rationale under even more tenuous facts than the present cause, is illustrated in Randall v. Mihm, 84 Ohio App.3d 402, 616 N.E.2d 1171. In Randall, an injured worker suffered a back injury while working. After two back surgeries failed to alleviate all of the pain and other symptoms associated with the injury, the worker's doctor ordered a CAT scan to detect any remaining pathology associated with the back injury. However, because the worker weighed in excess of three hundred pounds, the radiologist could not perform the scan because the worker was too heavy for the machine.
¶ 18 After many attempts to lose weight through various means failed, the worker decided to undergo gastric plication surgery or "stomach stapling". The surgery was successful in allowing the worker to lose the weight for the CAT scan, but resulted in numerous medical complications which eventually led to his death. Ultimately, the question regarding causation of the worker's death and the claim for benefits hinged on whether the evidence established with a reasonable degree of medical probability that "but for" the decedent's industrial back injury he would not have had the gastric plication which caused him to aspirate and die. The Randall court determined that the chain of events beginning with the back injury led to the order for a CAT scan and the gastric plication surgery, which led to the worker's death.
¶ 19 When reviewing resolutions of fact on non-jurisdictional issues from the three-judge panel of the Workers' Compensation Court, we do not re-weigh the evidence, but instead look for any competent evidence to support the trial court's findings.[15] Competent evidence is that which is relevant and material to the issue to be determined.[16] In the absence of competent evidence, the tribunal's decision may be viewed as legally erroneous and subject to appellate vacation.[17]
¶ 20 We find that the order of the Workers' Compensation Court trial court and Court en banc sustaining the trial court's denial of death benefits is unsupported by any competent evidence. The incontrovertible evidence and undisputed facts reflect that: prior to the back injury, the employee had never suffered any significant problems with his pacemaker; the need to check the pacemaker and remove and replace it appeared only after the disabling back injury and because of the back injury; and the replacement of the pacemaker was a necessary precursor to the operation for the back injury and would not have occurred but for the injury.
*697 ¶ 21 The question at issue is not whether the back injury somehow caused the pacemaker to malfunction or whether the pacemaker was old and would have needed replacing anyway. Nor is our decision based on whether the weight of the evidence reflects those issues. Rather, the determinative issues here are: 1) whether the surgery for the work related injury caused the need for the pacemaker surgery which ultimately led to the employee's death; and 2) whether any competent evidence exists to support a finding that the back injury was not causally connected to the death.
¶ 22 Dr. Young's statement offers nothing more than an opinion that the employee died while on the operating table for the pacemaker surgery and that the pacemaker was old. Dr. Young's opinion provides at page 72 of the record that:
"... In my opinion, this person's death was unrelated to his injury of May 15, 2000, as this person's pacemaker had gone past the normal life expectancy of a pacemaker and it had been (5) years since it had last been checked ..."
Nevertheless, it speaks nothing to the decisive issue in this cause  whether the pacemaker surgery would have occurred "but for" the back injury, i.e., whether the pacemaker surgery was made necessary at that time because of the back injury. The employee's cardiologist, Dr. Hauser recognized that the employee had the pacemaker surgery because of the back injury and that he may have gone on for a long period of time with the same pacemaker. His report at p. 66 of the record provides:
"... The only relationship that I can see is the fact that his referral for perioperative risk assessment was made because of his back surgery. Without this referral, and based on his past habits, it may well be that a period of time would have gone by before any formal interrogation was done...."
The employee's expert witness recognized, and the medical records reflect, that the pacemaker procedure was brought about as a means of covering the back surgeon's exposure to liability if he died during the back surgery.[18]
¶ 23 The dissent's objection to the application of the "but for" analysis to acts which are not a superceding cause of death, but which are part of the unbroken chain of causation to a work related injury is nothing new. The author was in the minority when the Court decided In the Matter of Death of Stroer, 1983 OK 94, 672 P.2d 1158, and remains in the minority today.[19] Under these facts, a finding that death benefits are not allowable pursuant to 85 O.S.2001 § 11[20] would result in a misapplication of the law, and ignore that the evidence reflected in the record leads to only one possible conclusion  that the employee's death was causally connected to the back injury.

CONCLUSION
¶ 24 When reviewing resolutions of fact on non-jurisdictional issues from the Workers' Compensation Court, we do not re-weigh the evidence, but instead look for any competent evidence to support the trial court's findings.[21] In the absence of competent evidence, the tribunal's decision may be viewed as legally erroneous and subject to appellate *698 vacation.[22] Here, no competent evidence supports a finding that the wife was not entitled to workers' compensation death benefits. The surviving spouse is entitled to death benefits because the unrefuted facts show the work-related back injury necessitated the pacemaker operation as a precursor to the back surgery.
CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; ORDER OF THE THREE-JUDGE PANEL OVERRULED; TRIAL COURT OVERRULED; CAUSE REMANDED.
WATT, C.J., HODGES, HARGRAVE, KAUGER, BOUDREAU, EDMONDSON, JJ., concur.
OPALA, LAVENDER, WINCHESTER, dissent.
OPALA, V.C.J., with whom WINCHESTER, J., joins, dissenting.
¶ 1 The court reverses the ruling of a workers' compensation trial tribunal. In doing so it redecides an issue of fact correctly resolved at first instance. Because the trial tribunal's critical finding  vacated today  stands on competent evidence, I recede from the court's pronouncement.

I

ANATOMY OF LITIGATION
¶ 2 In May of 2000 claimant sustained an accidental on-the-job back injury. A neurosurgeon determined in January of 2001 that a surgical procedure could alleviate discomfort in claimant's lower back. An examination before the operation revealed claimant's pacemaker was no longer functioning correctly. He died during a surgery performed to replace it.
¶ 3 Decedent's wife brought a compensation claim for death benefits. She averred her husband's death was the result of the accidental on-the-job back injury. Dr. LaRoy E. Young reviewed all of the pertinent medical records and concluded the on-the-job back strain did not cause claimant's death; rather, it was brought about by his more-than-twenty-year-old malfunctioning pacemaker, which was overdue for maintenance.[1] At the offer of Dr. Young's two reports (for submission into evidence), the trial judge inquired about objections, to which the claimant responded: "Just probative value ..." Like Dr. Young, the trial judge concluded the claimant's on-the-job back injury was not etiologically related to his death. The court's effort at parading the notion that the medical opinion which favors compensable causation is unrefuted has no support in the record. It is contradicted by Dr. Young, whose expert opinion is utterly free from probative value taint. Dr. Young's opinion (that favors noncompensable causation) is also shared by Dr. Hauser, decedent's own cardiologist. The latter physician concluded: "I see no particular causal relationship between Mr. Gray's back injury and his untoward event that occurred during the pulse generator replacement."[2] Claimant appealed to a three-judge panel, which adopted the trial judge's findings as correctly rested on competent evidence.[3]

II

THE COURT CAVALIERLY CASTS ASIDE ITS OWN PRECEDENT AND BLATANTLY DISREGARDS THE TERMS OF 85 0.S.2001 § 26 WHICH EXPLICITLY FORBID A REVIEWING COURT TO RE-WEIGH DISPUTED FACTS IN WORKERS' COMPENSATION REVIEW PROCEEDINGS
¶ 4 The provisions of 85 O.S.2001 § 26 mandate that the sole responsibility of this *699 court (and other appellate courts) is to confine itself to reviewing disputed issues of law and to examining the record for the presence of competent evidence to support the trial tribunal's findings.[4] The sole issue of law for consideration before this court  indeed the only matter this court is permitted to examine here  is whether Dr. Young's opinion (introduced as proof by his two admitted reports) is supported by competent evidence. Since there is no doubt that Dr. Young's reports are rested on competent evidence, the trial tribunal's order denying compensation must be affirmed. All other matters to which the court addresses itself in today's pronouncement are extraneous to the record and hence impermissibly considered.

III

DR. YOUNG'S EXPERT MEDICAL OPINION PRESENTS UNCHALLENGED COMPETENT EVIDENCE TO WHICH THE CLAIMANT'S FAILED TO INTERPOSE A SUSTAINABLE OBJECTION
¶ 5 The trial tribunal correctly considered Dr. Young's expert opinion. There was neither a sustainable objection interposed to its admission nor to the probative value of his expert opinion about the decedent's cause of death. Although the law authorized claimant to raise three objections to Dr. Young's medical reports, she most likely could not have had any of them sustained. Moreover, since claimant interposed no valid challenge to the employer's expert medical opinion, she waived her opportunity to do so. It is impermissible for this court to entertain objections waived by counsel's silence.[5]
¶ 6 Firstly, claimant could have challenged the competency of Dr. Young's expert opinion.[6] Secondly, claimant could have objected that Dr. Young's opinion was based on the assumption of flawed or incomplete facts. Though claimant did not challenge Dr. Young's opinion on misassumed grounds or inadequate facts, had that objection been made, it should have been overruled. The record clearly demonstrates Dr. Young's opinion is rested on a complete history containing all the critical medical information needed.[7]
¶ 7 Lastly, claimant did challenge the probative value of Dr. Young's affidavit,[8] and the judge noted her objection, but did not make a ruling at any time before issuing the order denying compensation. Claimant's objection to the probative value of Dr. Young's opinion is not sustainable. Claimant, who as the challenging party below bears here the burden of persuasion, failed to demonstrate the assailed evidence was not legally sufficient to support Dr. Young's opinion on causation.[9] More importantly, an objection to a medical report must be made in specific *700 terms.[10] In response to the trial judge's query, claimant uttered for the record nothing more than the four words "[j]ust to probative value." Claimant hence failed to meet the burden of her challenge (to the reports by Dr. Young) with sufficient specificity. Since claimant raised no valid objection to the two reports, there can be no doubt it was proper for the trial judge to consider them as evidence supportive of the findings the trial tribunal made. A ruling consistent with Dr. Young's expert medical opinion satisfies the law's requirement for competent evidence.

IV

THE DECEDENT'S CAUSE OF DEATH IS A DISPUTED ISSUE OF FACT UPON WHICH THE TRIAL TRIBUNAL'S RULING IS SUPPORTED BY COMPETENT EVIDENCE; THIS ALONE PLACES CAUSATION OF DEATH BEYOND THE STATUTORILY PERMISSIBLE ORBIT OF CONSIDERATION
¶ 8 Cause of death presented before the trial tribunal a disputed non-jurisdictional fact issue on which we must stand absolutely bound by the trial tribunal's resolution if it rests on competent proof.[11] It is simply impermissible for this court to reweigh adduced causation evidence that is free from probative-value infirmities.[12] The record and Dr. Young's expert medical opinion provide solid competent evidence to establish that the decedent's on-the-job back injury was not the cause of his death. According to the record, the reason decedent's pacemaker had to be surgically removed was not just the need for its replacement in advance of further surgery; it was more than twenty years old, had not been correctly maintained, and was capable of causing irregular heartbeats. Absolutely no evidence shows that the on-the-job injury caused the pacemaker to misfunction. Ample competent evidence demonstrates, in contrast, that the real cause of the decedent's fatal surgery was not his back injury, but his malfunctioning pacemaker, which had been implanted long before the compensable event.
¶ 9 Because the trial tribunal's finding is overwhelmingly supported by competent evidence, today's vacation of its order is statutorily impermissible. In deducing that the decedent's on-the-job back injury caused his death, the court sets forth what it considers the "incontrovertible facts" and concludes the back injury must have caused the claimant's death during surgery. An obvious legal error is ignored: resolving a disputed set of facts by a new finding  i.e., assuming on review the role of a fact finder  is exactly the genre of judicial re-examination that the provisions of 85 O.S.2001 § 26 explicitly prohibit.

V

THE COURT'S CAUSATION ANALYSIS PRODUCES NOT ONLY STATUTORILY IMPERMISSIBLE FACT-FINDING, IT IS ALSO MARRED BY LOGICAL ERRORS AND MISREPRESENTATION OF FACTS
¶ 10 The causation analysis on which the court rests its decision to vacate the trial tribunal's ruling is illogical and distorts the facts. The court's reasoning is deeply flawed for four reasons. Primarily, the court rests its case for a finding of causation different from that of the trial tribunal on the fact that the decedent had not had any problems with his pacemaker until after his on-the-job back *701 injury.[13] Medical evidence demonstrates the fact decedent had not experienced any problems before his injury was almost certainly not indicative of the pacemaker actually functioning flawlessly. Rather, the record demonstrates the reason for decedent's erroneous belief in the perfect condition of his pacemaker was that it had not been checked until after his back injury. Urging the decedent's back injury caused his death is tantamount to claiming the pacemaker screening caused the problems that it helped discover. Even if the decedent's pacemaker worked correctly before his back injury, there is not a shred of medical evidence to suggest his on-the-job injury precipitated the pacemaker's malfunction.
¶ 11 Secondly, the statement that "the need to check the pacemaker appeared only after the ... back injury" is not "incontrovertible." In fact, this statement is flatly contradicted by medical evidence (and common sense as well). The decedent's need to have his pacemaker checked existed regardless of his back injury. In fact, the record indicates the decedent's neglect of that responsibility  not his back injury  made "the need" for checking the pacemaker even greater.
¶ 12 Thirdly, the court posits that the on-the-job injury caused decedent's death because the pacemaker surgery was a necessary precondition to the back surgery. In its rush to reweigh the evidence, the court ignores the obvious fact that the proximate, "but for" cause for the ultimately fatal surgery was not the decedent's back injury, but his malfunctioning pacemaker. This logic is but another example of the way the court has misrepresented the facts by trivializing the decedent's aged and poorly-maintained pacemaker as a cause of the fatal surgery. The court argues decedent's need to replace his pacemaker was virtually unrelated to the health risk posed by a malfunctioning pacemaker, but was merely precondition for back surgery. It strains credulity and blatantly contradicts medical evidence to suggest that doctors would have ordered decedent to submit to a life-threatening heart surgery if they had not believed that  regardless of his decision to undergo a back procedure  the malfunctioning pacemaker posed a serious threat to his health.
¶ 13 Finally, the court impermissibly substitutes its own unqualified medical opinion for that of Dr. Young's. We have neither the medical expertise nor the statutory authority to do so. Put even more simply, this court is far from free to render medical opinions about the cause of claimant's death. Today's holding supplants the trial tribunal's factual findings, even though the latter's are both consistent with the findings of medical experts and rested on competent proof.

VI

EVEN IF THE COURT'S STATUTORILY IMPERMISSIBLE FACT FINDING WERE AUTHORIZED, ITS FINDING OF "BUT FOR" CAUSATION IS INSUFFICIENT BECAUSE IT FAILS TO DEMONSTRATE THAT THE RISK OF DYING DURING SURGERY TO REPLACE A PACEMAKER WAS A RISK INCIDENT TO THE DECEDENT'S EMPLOYMENT
¶ 14 The court's review of the compensation tribunal's fact finding not only steps beyond its statutorily allowable bounds of re-examination, but it also disregards well-established principles of causation in workers' compensation law. In order to be compensable, an accidental injury must both (1) occur in the course of employment and (2) arise out of the worker's employment.[14] The first requirement deals with the time and place of injury, and the second mandates that there *702 be causal connection between the injury and presence of risks incident to employment.[15]
¶ 15 Dr. Young found the cause of death was totally unrelated to the risks of employment. This element is firmly embraced within his opinion that the death "did not arise out of the risks associated with employment," but rather was brought about by a pacemaker flawed by age and long-deferred maintenance. Absolutely no medical evidence points to a causal link between the faulty pacemaker that required the surgical procedure that proved fatal and the decedent's on-the-job back injury. In fact, the decedent's own cardiologist, Dr. Hauser, stated that no such causal link existed. By holding decedent's death was a compensable injury, the court incorrectly posits that expiring during surgery to replace one's malfunctioning pacemaker was a risk incident to the decedent's employment.
¶ 16 The law's requirement for a compensable injury to be related to employment is functionally similar to that of proximate cause for tort liability. Both requirements negate the overbroad liability that would stem from pure "but for" causation. When stretched to its limits, as it is in this case, "but for" causation can link occurrences with tenuous connections and hold parties liable whose acts or omissions are virtually unrelated to the event. For example, if "but for" causation were the only requirement for legal liability, as this court holds here, an injured party could sue a tortfeasor's parents because, "but for" the tortfeasor's parents' procreation, the tortfeasor would not have existed and the harm would not have occurred.[16] A finding that an on-the-job injury was the "but for" cause of harm may be a necessary but not a sufficient condition for finding a claim compensable under workers' compensation law.[17] Requiring only "but for" causation forces employers to assume far more liability than is contemplated by the provisions of 85 O.S.2001 §§ 11, 12 and 122.[18]

VII

SUMMARY
¶ 17 Once a workers' compensation court has rendered a critical finding dispositive of the claim, its resolution may be reviewed in this court solely for errors of law.[19] Today's holding is tainted by statutorily interdicted appellate fact finding. Since claimant objected to neither the admissibility nor to the probative value of Dr. Young's testimony, and the record would sustain none interposed here sua sponte, his expert medical opinion was appropriately incorporated into the record. A trial tribunal's finding consistent with Dr. Young's expert opinion is hence amply supported by competent evidence. Today's pronouncement misrepresents certain facts of the case as undisputed, is legally impermissible, and hence errs as a matter of law by replacing a medical expert's opinion with the court's own idea of causation. Moreover, the court's conclusion is predicated upon the legally impermissible and imprudent notion that harm sustained by an employee, to be compensable, need only stem from a "but for" consequence of an on-the-job injury. This court's jurisprudence correctly mandates that the accidental harm sustained and to be compensated be the result of an employment-related risk. Competent evidence demonstrates solid support for the trial tribunal's order denying compensation. It should be sustained.
¶ 18 Engaging in appellate choice-making between two divergent medical opinions, both entirely free of probative-value and other evidentiary infirmities  one that favors compensability and the other that does not  is an unauthorized exercise of this court's limited statutory powers of review in workers' *703 compensation proceedings. Critical comments about Dr. Young's opinion are not enough to nullify the probative strength of his expert testimony. It matters not whether he is worthy of the justices' belief; the court's sole legal concern here is the adduced forensic proof's value as evidence. If that value is present, judicial choice-making is clearly prohibited.
NOTES
[1] Title 85 O.S.2001 § 11 provides in pertinent part:

"A. Every employer subject to the provisions of the Workers' Compensation Act shall pay, or provide as required by the Workers' Compensation Act, compensation according to the schedules of the Workers' Compensation Act for the disability or death of an employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of employment, without regard to fault as a cause of such injury, ..."
[2] The first notice of death claim for compensation filed in the Workers' Compensation Court on August 3, 2001, lists the dates of injury as 9/14/99 and 5/16/00 and describes the injury as a strain to left knee and herniated disk in lower back. According to the shift supervisor's incident notification worksheet dated 9/15/99, the claimant sustained an injury on 9/14/99 to his knee while getting up. In another worksheet, dated 5/16/00, it was reported that the claimant hurt his back picking up a box of insulation. As a result of this injury, he was sent to the doctor. Apparently, it was the back injury that precipitated this cause. The employee described the injury as an initial tightening in his back followed by a hot pain shooting down his right leg later that evening after he sneezed.
[3] The neurosurgeon who recommended surgery on December 11, 2000, was another neurosurgeon who was affiliated with the neurosurgeon who initially saw the injured worker in July of 2000.
[4] The record also includes a referral dated October 26, 2000, from an Ardmore doctor asking for a determination of whether the pacemaker needed to be removed and replaced.
[5] Dr. Timothy Hauser's report at p. 37 provides in pertinent:

"... While he clinically has no symptoms suggesting coronary insufficiency or heart failure, he also has quite limited physical activity for several months, some risk factors for coronary insufficiency, and what sounds like a very extensive and lengthy surgery requiring general anesthesia. Towards that end, I think non-invasive screening of coronary artery integrity and left ventricular function with Adenosine thallium imaging would be warranted...."
[6] Dr. Hauser's report at p. 39 provides in pertinent part:

"... As you also know, I have visited with Dr. Mark Harvey, the electrophysiologist in our group, who felt just as strongly as I did that based on what we know about your current situation regarding your pacemaker, that probably the most conservative and straightforward approach would be to replace your current pulse generator.
...
As you also know, you can elect to do nothing and it may well be that you would do fine. However, the pacemaker interrogation did suggest that your pacemaker is very capable of pacing at times when it shouldn't and that raises the possibility of an abnormal heart rhythm being triggered...."
[7] The trial transcript provides in pertinent part at:

p. 6
"... Q. How long had that pacemaker been in place in his body?
A. Approximately 20 years.
Q. Did he routinely have that pacemaker checked?
A. Yes.
Q. And prior to his death had he experienced any malfunctions or any problems with that pacemaker?
A. No.
Q. To your knowledge had anyone recommended that it be removed prior to his injury with the back problems?
A. No...."
pp. 13-14
"Q. Your husband referred back to Dr. Hauser, his cardiologist, to check the pacemaker and in fact it had not been checked for more than five years at that point, is that correct, or do you know?
A. I don't think it had been five years.
Q. It was not responding, according to the medical records the way it should have, are you aware of that?
A. No...."
[8] Dr. Brant's medical report admitted as claimant's exhibit # 1 provides in pertinent part:

"... After reviewing medical records from Dr. Remondio, Mercy Health Center, Dr. Michael Hahn, and Dr. Hauser and the history given by Mrs. Gray, it is my medical opinion that Mr. Gray's death is a direct result of the injury that he sustained to his lumbar spine while working for Ultramar Diamond Shamrock, as he would not have had to undergo replacement of his pacemaker if the injury to his back had not occurred."
Dr. Brant's deposition provides in pertinent part at pp. 18-19:
"Q. And in this particular case, to your knowledge, if you can answer, would you agree that the fact that the reason why he needed a new pacemaker or battery, that part was not in a way associated with any type of injury or Workers' Comp claim?
A. No, I'm not saying that. I'm not saying that his Workers' Comp injury caused his pacemaker problem. I'm saying that it's a different  you've got two steps there. Workers' Comp injury causes back problem. Back problem doctor said, `Let's go look at the pacemaker before I do the surgery I want to do.' It's not a direct, it's an indirect. It's two steps away. You know, the pacemaker  ...
Q. Right. As far as the pacemaker needing to be replaced, in other words, malfunctioning, battery needing to be replaced or life expectancy of the pacemaker, the fact that it needed to be taken out would have resulted even if the claimant was not injured on May 15th, 2000?
A. Not necessarily.
MR. RALSTIN: Hold on. Let me make an objection, Doctor. I'll object as to assuming facts not into evidence and that is misstates the medical history of this witness. It's an inaccurate account of the whole situation. There's no evidence of any malfunction of the pacemaker prior to him dying on the table.
THE WITNESS: And that's  what I'm saying is  I think what you're trying to say is the pacemaker was going to need this anyway. That's not  what I'm saying is that he was asymptomatic. He had no problem with his pacemaker. The only reason that they even decided to remove the pacemaker was because of the back injury ..."
[9] The letter provides in pertinent part:

"... Your specific question, as I understand it, is whether or not there is any relationship between Mr. Gray's back injury and his death that occurred during pulse generator replacement. The only relationship that I can see is the fact that his referral for preoperative risk assessment was made because of his back surgery. Without this referral, and based on his past habits, it may well be that a period of time would have gone by before any formal interrogation was done.
While you may wish to consider an opinion from Dr. Harvey, who actually performed the procedure, other than what I have outlined above, I see no particular causal relationship between Mr. Gray's back injury and his untoward event that occurred during pulse generator replacement...."
[10] The letter states in pertinent part:

"... In my opinion, this person's death was unrelated to his injury of May 15, 2000 as this person's pacemaker had gone past the normal life expectancy of a pacemaker and it had been five (5) years since it had last been checked...."
[11] Comments on the report at p. 162 provide:

"Mostly Normal Sinus Rythm [sic] with off & on Paced Rythm [sic]. No significant Arrhythmia. Rate Within Normal Range."
[12] Title 85 O.S.2001 § 11, see note 1, supra.
[13] Id.
[14] See also, Johnson v. Hillcrest Health Center, Inc., 2003 OK 16, ¶ 13, 70 P.3d 811[The applicable standard of care and deviations therefrom causing an injury are ordinarily established by expert testimony, unless the common knowledge of lay persons would enable a jury to conclude the applicable standard of care and whether its breach caused the injury.].
[15] B.E. & K. Construction v. Abbott, 2002 OK 75, ¶ 1, n. 1, 59 P.3d 38; Hughes v. Cole Grain Co., 1998 OK 76, ¶ 5, 964 P.2d 206; Garrison v. Bechtel Corp., 1995 OK 2, ¶ 8, 889 P.2d 273; Lacy v. Schlumberger Well Service, 1992 OK 54, ¶ 7, 839 P.2d 157; Parks v. Norman Municipal Hospital, 1984 OK 53, ¶¶ 12-13, 684 P.2d 548.
[16] OKC Refining Company, Inc. v. Gold, 1985 OK 42, ¶ 12, 701 P.2d 1034, City of Oklahoma v. Lindsey, 1976 OK 48, ¶ 14, 549 P.2d 81; Joseph A. Coy Co. v. Younger, 1943 OK 160, ¶ 5, 136 P.2d 890.
[17] Hughes v. Cole Grain Co., see note 15, supra; P.F.L. Life Ins. Co. v. Franklin, 1998 OK 32, ¶ 26, 958 P.2d 156; Parks v. Norman Municipal Hospital, see note 15, supra.
[18] Dr. Brant's deposition provides in pertinent part at p. 13:

"What we do is say, `Let's send him to the cardiologist because I want to have it evaluated that is this pacemaker ready, are we ready to go to surgery.' It's called CYA, covering your ass...."
[19] In the Matter of Stroer, 1983 OK 94, 672 P.2d 1158, Opala, J. joined the Simms, J., concurrence in part and dissent in part which provided in pertinent part:

"I concur in that part of the opinion which holds that suicide is compensable if it occurs as a direct and causal result of a work related injury.
I dissent, however, to the award under the facts of this case...."
[20] Title 85 O.S.2001 § 11, see note 1, supra.
[21] B.E. & K. Construction v. Abbott, see note 15, supra; Hughes v. Cole Grain Co., see note 15, supra; Garrison v. Bechtel Corp., see note 15, supra; Lacy v. Schlumberger Well Service, see note 15, supra; Parks v. Norman Municipal Hospital, see note 15, supra.
[22] Hughes v. Cole Grain Co., see note 15, supra; P.F.L. Life Ins. Co. v. Franklin, see note 17, supra; Parks v. Norman Municipal Hospital, see note 15, supra.
[1] This conclusion is supported by Dr. Young's reports as well as a letter from Dr. Hauser, the decedent's cardiologist. Dr. Hauser recorded that decedent's maintenance of his pacemaker had been "sporadic at best." (R. 36).
[2] R. 66.
[3] The Court of Civil Appeals upheld the trial tribunal's findings.
[4] The terms of 85 O.S.2001 § 26 provide: "The decision of the [workers' compensation] court shall be final as to all questions of fact ..." See Parks v. Norman Mun. Hosp., 1984 OK 53 ¶ 4, 684 P.2d 548, 549.
[5] See Whitener v. South Cent. Solid Waste Auth., 1989 OK 62 ¶ 5, 773 P.2d 1248, 1250.
[6] A competency objection is essentially a challenge to the admissibility of proof on hearsay grounds. Whitener, 1989 OK n. 1, 773 at 1249. Had the judge sustained a competency objection, claimant and respondent would have had the opportunity to examine and cross-examine Dr. Young by deposition. Since the claimant did not raise the objection, the competency issue is moot.
[7] See Whitener, 1989 OK at ¶ 5, 773 at 1250 n. 6.
[8] A challenge to the probative value of an expert medical opinion is not about the evidence's admissibility; it questions the sufficiency of the opinion as legal proof to show: (1) medical findings about the presence or absence of compensable disability and (2) the compensable impairment's rating. Whitener, 1989 OK ¶ 2 n. 1, 773 at 1249 n. 1. The critical issue raised by an objection to evidence's probative value tests whether the evidence  once admitted  will be probative of the facts it seeks to establish. Put more simply, the objection casts a doubt on whether the evidence tends to establish what it is offered to prove. See Id. A challenge to probative value is not a true evidentiary objection; it does not negate the evidence's admissibility. See Id. Rather, a probative value challenge functions much like a demurrer in a district court case; it attacks the proof's legal sufficiency, not its admissibility. See Id.
[9] Cf. Whitener, 1989 OK at ¶ 5 n. 6, 773 at 1250 n. 6. (describing the burden one must sustain for an objection to an expert opinion).
[10] See Beets v. Metropolitan Life Ins. Co., 1999 OK 15 ¶ 5, 995 P.2d 1071, 1078 (Opala, J., dissenting); Gaines v. Sun Refinery and Mktg., 1990 OK 33 ¶ 21, 790 P.2d 1073, 1080.

According to the rule set forth in Gaines:"The objection may be either for lack of competency or lack of probative value, but an objection with a mere reference to lack of A.M.A. Guidelines will not suffice for specificity. A party must state the specific provision of Rule 20 and/or the A.M.A. Guidelines which is the basis of the objection." See Id.
[11] See supra note 4.
[12] See 85 O.S.2001 § 26, supra note 4; Bostick Tank Truck Service v. Nix, 1988 OK 128 ¶ 2, 764 P.2d 1344, 1346; Parks, OK at ¶ 12, 684 at 552; Haynes v. Pryor High School, 1977 OK 1 ¶ 12, 566 P.2d 852, 854.
[13] In this reasoning there are two flawed assumptions. First, it assumes that the pacemaker began to misfunction after the back injury. Secondly, it posits that when two events occur in chronological order, the early necessarily causes the later. Post hoc ergo propter hoc. Black's Law Dictionary 1186 (7th ed.1999). This logic defies both common sense and time-honored principles of causation.
[14] See American Management Systems, Inc. v. Burns, 1995 OK 58 ¶ 5-6, 903 P.2d 288, 290-91; Corbett v. Express Personnel, 1997 OK 40 ¶ 7, 936 P.2d 932, 933-34; Odyssey/Americare of Oklahoma v. Worden, 1997 OK 136 ¶ 13, 948 P.2d 309, 312; PESP/TSI Staffing v. Weese, 2003 OK CIV APP 15 ¶ 9, 64 P.3d 569, 572.
[15] See Id.
[16] As the now-famous Chaos Theory espouses, catastrophic world events may be the direct result of the single flap of a butterfly's wings somewhere in South America. A Brazillian butterfly may hence be the "but for" cause of a hurricane off the coast of Cape Cod.
[17] See supra note 12.
[18] See Keir DeAnda v. AIU Insurance and AIG Claim Services, Inc., 2004 OK 54 ¶ 4, 98 P.3d 1080, 2004 WL 1447687 (Opala, V.C.J., concurring).
[19] See supra note 4.